# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joshua Conner, | No. CV-17-00340-TUC-BPV |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Joshua Conner filed the instant action pursuant to 42 U.S.C. § 405(g) seeking review of the final decision of the Commissioner of Social Security. The Magistrate Judge has jurisdiction over this matter pursuant to the parties consent under 28 U.S.C. § 636(c). (Doc. 8). The matter is now fully briefed before this Court. (Docs. 16-18). For the following reasons, the Court orders that the Commissioner's final decision in this matter is affirmed.

## I.    Procedural History

On July 23, 2013, Plaintiff filed an application for Supplemental Security Income. (Administrative Record (AR) 160). Plaintiff alleged disability as of July 23, 2013 due to severe manic depression, suicidal thoughts, and pain and numbness in his right arm. (AR 194). Plaintiff's application was initially denied on February 14, 2014 (AR 138), and upon reconsideration on August 19, 2014 (AR 146). On January 6, 2016, Plaintiff appeared with counsel and testified at an administrative hearing in front of an Administrative Law Judge (ALJ). (AR 84). The ALJ issued an unfavorable decision on

March 3, 2016. (AR 19-30). Following Plaintiff's Request for Review, on June 12, 2017, the Appeals Counsel denied Plaintiff's request (AR 1-3), making the ALJ's decision the Commissioner's final decision for the purposes of judicial review.

Plaintiff filed the instant action arguing the ALJ erred: (1) by failing to consider Plaintiff's credibility; (2) by finding Plaintiff's arm impairment was not severe; (3) by giving incorrect weight to examining source Dr. Andrew C. Jones, Ph.D.; (4) by using her own medical opinion in lieu of examining physician Dr. Jill Plevell, Ph.D.; and (5) by failing to develop the record. (Doc. 16).

## II. Plaintiff's Background, Statements in the Record, and Vocational Expert's Findings

Plaintiff was 28 years old on the date of the alleged onset of disability. (AR 29). Plaintiff finished high school where he was enrolled in special education classes, and subsequently took a few courses at community college but did not graduate. (AR 88). Plaintiff testified at the hearing before the ALJ that he had previously worked in fast food, as meat cutter, in construction, and as a janitor. (AR 89, 100-01).

The ALJ asked the Vocational Expert (VE) if there was work available for an individual with no physical limitations but limited to repetitive, unskilled tasks. (AR 102). The VE stated that such individual could work in fast food, as a kitchen helper, a janitor, or in assembly production. (*Id.*) Plaintiff's attorney additionally asked whether there was work available if an individual needed sheltered work with constant supervision, had reading and math difficulties, could not perform data entry in a computer because of cognitive disabilities, and had difficulty with repetitive assembly jobs because of his right arm impairment. (AR 104). The VE responded that the aforementioned employment would have to be sheltered work. (*Id.*).

## III. Summary of ALJ's Findings

Whether a claimant is disabled is determined pursuant to a five-step sequential process. *See* 20 C.F.R. §§ 404.1520, 416.920. To establish disability, the claimant must show: (1) he has not performed substantial gainful activity since the alleged disability

onset date (step one); (2) he has a severe impairment(s) (step two); and (3) his impairment(s) meets or equals the listed impairment(s) (step three). *Id.* "If the claimant satisfies these three steps, then the claimant is disabled and entitled to benefits. If the claimant has a severe impairment that does not meet or equal the severity of one of the ailments listed[,] . . . the ALJ then proceeds to step four, which requires the ALJ to determine the claimant's residual functioning capacity (RFC)." *Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015). At this step, the ALJ considers (1) whether there is an impairment that would reasonably be expected to cause the plaintiff's symptoms, and (2) the severity of plaintiff's ailments, including intensity, persistence, and limiting effects of alleged symptoms. If the claims of intensity, persistence and limiting effects are not supported by medical evidence, the ALJ needs to determine, based on the record, whether plaintiff's claims are credible. Social Security Ruling (SSR) 96-7 (superseded by SSR 16-3 (Mar. 28, 2016)). At step five, "[a]fter developing the RFC, the ALJ must determine whether the claimant can perform past relevant work." *Dominguez*, 808 F.3d at 405. At this stage, "the government has the burden of showing that the claimant could perform other work existing in significant numbers in the national economy given the claimant's RFC, age, education, and work experience." *Id.*; 20 C.F.R. §§ 404.1520, 416.920.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 23, 2013. (AR 21).

Then, at step two, the ALJ determined that several of Plaintiff's ailments were severe, including: "mental impairments variously diagnosed to include bipolar disorder, depressive disorder, anxiety disorder, polysubstance dependence, and post-traumatic stress disorder." (AR 21).

However, the ALJ determined that Plaintiff's reported right arm numbness was not severe. (AR 21-22). She stated that while Plaintiff had an initial record of treatment with medication, there were no further records of treatment and only one subsequent consult for the problem. (AR 21). During this consult, Plaintiff claimed that he was still able to perform all of his daily activities. (AR 21-22, 476). The ALJ noted Plaintiff had minimal

- 3 -

decreased sensation, full range of motion, and the minimal limitation precluded a finding of severity. (AR 21-22). The observations of Dr. John Kurtin, Dr. Charles Combs, and Dr. Joseph Ring, D.O. further supported her determination that Plaintiff's impairments were not severe. (AR 22, 112, 476-478).

The ALJ decided, at step three, that Plaintiff's impairments did not meet or equal the listed impairments. (AR 22). The ALJ noted that she considered both the severe and non-severe impairments when coming to her decision. (*Id.*).

The ALJ found that Plaintiff's RFC included a full range of work at every exertional level, but limited him to unskilled tasks that were repetitive and did not require a great deal of skill. (AR 25). Although the ALJ conceded that Plaintiff's medical impairments could cause the purported symptoms, the ALJ stated that the medical evidence did not support the contention that Plaintiff could not perform daily activities and remember simple tasks. (AR 25, 117, 514).

The ALJ then determined that Plaintiff's conflicting assertions as to the intensity, persistence, and limiting effects of his symptoms were not credible. (AR 26). The ALJ explained that she was incredulous about Plaintiff's claim he could not work due to his symptoms because his prior job history indicated: (1) he was capable of working an eight-hour-day; (2) he left his last job because he was no longer required to work as a condition of probation, not because of any impairment; and (3) his explicit statements about his decision to leave showed he had ulterior motives for not working. (AR 27). Since there was also no evidence of worsening after 2010, the ALJ concluded that Plaintiff's self-disclosed symptoms were unreliable and he was capable of working under the stated RFC. (AR 27, 370).

Furthermore, the ALJ determined that Plaintiff's self-disclosed history of drug abuse was questionable. The ALJ noted that Plaintiff had a significant history of marijuana use. (AR 27). Subsequent to the state's refusal to designate Plaintiff as mentally ill because of the drug abuse (AR 451-52), Plaintiff's disclosure became inconsistent with prior statements and minimized his prior and present use. (AR 27, 91,

437, 449, 477, 484, 492, 499). This suggested Plaintiff was motivated to minimize his drug use because he was aware that his disclosure may affect his ability to obtain both state and federal benefits. (AR 27).

Third, the ALJ found that despite his claim that he was unable to live independently, Plaintiff had revealed he was functioning well socially, had a girlfriend, and was able to fulfill daily activities. (AR 23, 441, 476). In addition, Plaintiff admitted that he was physically able to accomplish his activities of daily living, but was "too lazy to do so." (AR 23, 465, 514).

Finally, insofar as the physicians' records were inconsistent with the ALJ's RFC, the ALJ noted that, the medical opinions suggesting Plaintiff's symptoms were more serious relied heavily upon the Plaintiff's subjective assertions, and since the Plaintiff's credibility was in question, so too were the determinations by physician Dr. Andrew Jones (AR 487) and vocational evaluator Philip Shapiro (AR 541). (AR 28). Furthermore, the ALJ gave little weight to the inconsistent opinions of Mr. Shapiro and John Ekman, NP-C because they were not acceptable sources. (*Id.*).

At step five, the ALJ concluded that Plaintiff was not disabled; and given Plaintiff's RFC, age, education, and work experience he would work as a kitchen helper, a janitor, or in assembly production. (AR 30).

**IV.    Standard of Review**

The Court has the "power to enter, upon the pleadings and the transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The factual findings of the Commissioner shall be conclusive so long as the findings are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue,* 533 F.3d 1035, 1038 (9th Cir. 2008).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance,'" *Tommasetti,* 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481

F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)). Moreover, the Commissioner, not the Court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence, and determine the case accordingly. *Matney*, 981 F.2d at 1019.

However, the Commissioner's decision "cannot be affirmed simply by isolating a specific quantum of supporting evidence. . . . Rather, the Court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion." *Tackett,* 180 F.3d at 1098 (internal citations and quotations omitted).

## V. Discussion

### a. ALJ's Credibility Determination

Plaintiff contends that the ALJ failed to name clear and convincing reasons for questioning Plaintiff's credibility. Plaintiff claims that the ALJ should have stated which symptoms were (in)consistent with the available evidence and how the symptoms led to the ALJ's conclusions. (Doc. 16 at 18). The Court finds that the ALJ did provide specific and legitimate reasons for discrediting Plaintiff's subjective symptoms.

The ALJ stated that Plaintiff claimed he could not conduct routine daily activities, but the record demonstrated otherwise. First, the ALJ pointed out that Plaintiff told various providers specifically that he *was* able to take care of his daily activities. (AR 441, 476). "'Engaging in daily activities that are incompatible with the severity of the symptoms alleged can support an adverse credibility determination.'" *Treviso v. Berryhill*, 871 F.3d 664, 682 (9th Cir. 2017) (quoting *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014)).

Like the activities of daily living, the ALJ found Plaintiff's claims of suicidal thoughts unavailing because he directly contradicted himself when he told Dr. Jones he no longer had thoughts of suicide. (AR 26, 484).

In addition, the ALJ determined that Plaintiff's claim he cannot function socially

was contradicted by his report that he had friends, a girlfriend, and reported he got along with others. (AR 127, 203, 465, 476).

Moreover, the ALJ found that Plaintiff's claim that he was unable to work was not credible because his prior work demonstrated: (1) he could work a full workday, (2) he did not quit work because of his alleged disability, but rather he was no longer motivated to work because his probation was over, and (3) he was capable of performing repetitive tasks with little direction. (AR 26-27). The ALJ stated that the reason Plaintiff left his previous job was not due to his ailments, but rather because his period of court-ordered probation had expired. (AR 26, 88-89, 484). In addition, there was no indication that Plaintiff's impairments had worsened since 2010. (AR 27, 370-408).

As to Plaintiff's claims of drug dependency, the ALJ found that there was a change in Plaintiff's disclosed drug use which coincided with the revelation that his benefits may be affected. (*See* AR 91 (January 2016: 1 1/2 years since last smoked pot); AR 502 (October 2014: smoked daily since high school with last use ten months ago); AR 492, 499 (April 2014: never smoked on regular basis, never had a problem, and last smoked approximately six months ago); AR 492 (February 2014: denies smoking on regular basis and marijuana use has never been a problem); AR 484 (February 2014: states "will smoke marijuana when its available"); AR 477 (December 2013: only occasional marijuana use); AR 113, 437 (August 2013: used cannabis within last few days, uses daily and "as often as I can"; AR 449 (August 2013: chronic cannabis use is the only thing that makes him feel better)). Lack of motivation and "little propensity to work" in conjunction with conflicting information about drug use may support a finding the claimant is not credible. *See Thomas v. Barnhart*, 278 F.3d 948, 959 (9th Cir. 2002).

"In reaching a credibility determination, an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009). The ALJ considered Plaintiff's activities, work, and self-disclosed statements in order to reach her determination that Plaintiff's allegations were not credible. The Court finds that the ALJ's credibility determination provided clear and

convincing reasons based on substantial evidence to question Plaintiff's alleged disabling symptoms.

### b. ALJ's Finding that Right Arm Impairment was not Severe

Plaintiff sustained an injury to his right arm when a bucket fell on it, catching his arm in a skid loader. (AR 476). This injury reportedly caused pain and numbness. (AR 476). An evaluation by vocational expert Phillip Shapiro concluded that Plaintiff had limited feeling and intermittent numbness in his right arm. (AR 553-54). Shapiro also stated that Plaintiff scored low on a manual dexterity test and therefore it would be difficult for him to work in assembly production. (AR 557). Plaintiff argues that the ALJ committed legal error because she did not properly consider Mr. Shapiro's evidence of Plaintiff's limitations because he was a non-acceptable medical source. (Doc. 16 at 16).

The opinion of a vocational evaluator is considered an "other source." *Raisor v. Comm'r of Soc. Sec.*, 2:16-CV-01500-CKD, 2017 WL 4270052, at *7 (E.D. Cal. Sept. 26, 2017). "[Other sources] are not entitled to the same deference [as acceptable medical sources]. . . . The ALJ may discount testimony from these 'other sources' if the ALJ 'gives reasons germane to each witness for doing so.'" *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); see 20 C.F.R. § 404.1527; SSR 06-03p.

Despite Plaintiff's claims to the contrary, the ALJ *did* consider the noted functionally limiting effects observed by non-acceptable medical source Mr. Shapiro, and gave them some weight. (AR 28). The ALJ stated that Mr. Shapiro, who was hired by Plaintiff's representative, based his conclusions primarily from Plaintiff's subjective assertions, which the ALJ previously determined were not credible. (*Id.*). Furthermore, Mr. Shapiro had not referenced Plaintiff's medical records at all. (*Id.*). In addition, Mr. Shapiro rated Plaintiff's manual dexterity significantly lower than a similar evaluation conducted by a medically acceptable source. (AR 28, 557).

The ALJ determined Plaintiff's right arm numbness was not severe because Plaintiff's initial numbness was treated with gabapentin (AR 435), but there was no further evidence of treatment for his symptoms. (AR 21). She also considered the evaluation by the medically-acceptable examiner, Dr. Joseph Ring, which stated that

Plaintiff was capable of doing all the activities of daily living, had full range of motion, excellent grip strength, and good hand dexterity. (AR 22, AR 478). Dr. Ring also noted Plaintiff had normal skin sensation to a skin prick with only a mild decrease in sensation when using a brush. (AR 22, 476-78). Further, the ALJ gave great weight to the consistent determinations of Dr. John Kurtin and Dr. Charles Combs, who also found that Plaintiff's arm limitations were not severe. (AR 22, 112, 129).

Plaintiff has failed to show the ALJ's decision did not provide germane reasons, for discounting Mr. Shapiro's evaluation. Furthermore, the ALJ cited to specific evidence in the record that showed Plaintiff's functionally limiting effects were *de minimus*, causing only transient numbness which would not limit his ability to do basic work activities. Finally, the ALJ considered both the severe and non-severe limitations in her RFC determination and did not err by giving greater weight to the observations of a medically-acceptable doctor over a non-acceptable source hired by Plaintiff's representative. There were germane reasons for discounting Mr. Shapiro's observations, and substantial evidence existed supporting her determination that Plaintiff's right arm pain and numbness were not severe.

### c. Weight Given to Examining Physician Dr. Andrew C. Jones

Plaintiff further argues that the ALJ erred by giving little weight to the opinion of Psychologist Dr. Andrew Jones simply because part of his opinion was based on Plaintiff's subjective observations. (Doc. 16 at 14). Plaintiff states that any psychological evaluation would be similar to that of Dr. Jones: a mixture of observation, patient disclosure, and examination. (*Id.* at 14-15). In addition, the ALJ should not have discounted Dr. Jones' opinion because he did not suspect Plaintiff was malingering. (*Id.* at 15).

There are three types of medical opinions (treating, examining, and non-examining) and each type is, for the most part, accorded different weight. *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009); *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). Generally, the opinion of a treating source is given greater weight than the opinion of a doctor who did not treat the claimant. *See Turner v.*

*Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010); *see also Carmickle v. Comm'r,* 533 F.3d 1155, 1164 (9th Cir. 2008) ("Those physicians with the most significant clinical relationship with the claimant are generally entitled to more weight than those physicians with lesser relationships.").

An ALJ may reject a physician's opinion that has been contradicted by another opinion by "providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Lester*, 81 F.3d at 830). Additionally, an ALJ provides sufficient reasoning for rejecting a physician's opinion "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings. The ALJ must do more than offer [her] conclusions. . . . [Sh]e must set forth [her] own interpretations and explain why they, rather than the doctors', are correct." *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007) (internal citations omitted).

Like Mr. Shapiro's, the ALJ found that Dr. Jones' opinion from February 8, 2014 relied heavily on Plaintiff's subjective statements. (AR 28). However, Dr. Jones made independent observations about Plaintiff's appearance. He stated that Plaintiff's hair was dirty and unkempt, but his hands and body were clean. (AR 485). Separate from Plaintiff's disclosure, Dr. Jones noticed that Plaintiff was able to articulate clearly, appeared to think logically, and had a normal energy level. (AR 485). Dr. Jones also perceived that "[h]is mood was euthymic and his affect was appropriate and congruent. He demonstrated no difficulties interaction on a one-on-one basis with this clinician." (*Id.*).

Upon examination, Dr. Jones noted that Plaintiff scored 25/30 on the Mini Mental State Exam. (*Id.*). On the exam, Plaintiff missed points on "remote recall, as well as 3 points on serial 7s." (*Id.*). Based on this exam, Dr. Jones estimated that Plaintiff's intelligence was low-average, he had difficulty with recall, and he could not manage benefit payments. (AR 485-86). Dr. Jones concluded that this difficulty with recall would moderately limit his ability to remember work procedures. (AR 486).

The ALJ found that the statements about concentration, persistence, and pace were

consistent with the record, and gave significant weight to these findings. (AR 28). But, the ALJ gave Dr. Jones' opinion about Plaintiff's social interaction and adaptation to change little weight because she found it inconsistent with the record as a whole. (AR 28, 487). The ALJ explained: (1) Plaintiff's testimony was not credible; (2) Dr. Jones' evaluation relied heavily on Plaintiff's subjective complaints, even when the findings conflicted with his MMS Exam; (3) the doctor did not explain how he reconciled these differences; and (4) the doctor's conclusions were inconsistent with the record as a whole. (AR 28).

The opinions which the ALJ gave little weight were threefold. First, Dr. Jones opined that at work, Plaintiff would have marked difficulties making independent decisions and adapting to changes in work environment. (AR 28, 487). Second, the doctor concluded that Plaintiff would have moderate social limitations. (*Id.*). Finally, Dr. Jones stated that Plaintiff would have moderate difficulty maintaining a clean and neat appearance. (*Id.*).

The Court finds that the ALJ pointed to specific and legitimate evidence in the record and in Dr. Jones' own opinion that contradicted Dr. Jones' conclusions regarding Plaintiff's social and adaptational capabilities. First, she cited to instances where Plaintiff was able to engage in appropriate social interaction. (AR 441, 476); *see Roberts v. Acting Comm'r of Soc. Sec,* No. CV-17-00195-PHX-GMS, 298 F.Supp.3d 1232, 1239 (D. Ariz. 2017) (ALJ may discount physician's opinion based on claimant's subjective complaints and objective evidence that such complaints are not credible); *Calkins v. Astrue*, 384 Fed.Appx. 613, 615 (9th Cir. 2010) (same). Earlier in the opinion, the ALJ also gave great weight to the opinions of psychologists Dr. Margaret Friedman and Dr. Eugene Campbell, both of whom described Plaintiff as socially appropriate and a compassionate human being, which suggests he is capable of adapting to interpersonal changes and engaging in social interactions, in contrast to Dr. Jones' findings. (AR 113, 134).

In addition, the ALJ cited to evidence in the record that conflicted with Dr. Jones' statements about Plaintiff's grooming ability. The ALJ referred to instances demonstrating that Plaintiff was capable of taking care of himself and participating in

routine daily activities. (AR 441, 476).

Furthermore, the ALJ gave less weight to Dr. Jones' opinion because where his observations conflicted with his conclusion, he failed to account for the differences. For example, Dr. Jones observed that Plaintiff's responses were appropriate: he was amicable and capable of interacting appropriately one-on-one, and his mood was stable. (AR 485). The ALJ discredited Dr. Jones because he did not reconcile these observations with his conclusion that Plaintiff would be unable to handle environmental changes or criticism. (AR 28).

Dr. Jones also expressed that Plaintiff would have a moderate limitations in his ability to maintain a clean appearance. (AR 487). But, Dr. Jones observed that even though his hair was dirty, the rest of his body was clean with no odor. (AR 485). Furthermore, Dr. Jones stated Plaintiff informed him he needed no assistance maintaining personal hygiene. (*Id.*). Dr. Jones provided no explanation for why, despite Plaintiff's physical appearance and claims to the contrary, Dr. Jones decided Plaintiff could not maintain cleanliness.

The Court finds that the ALJ gave cogent reasons for giving Dr. Jones' evaluation of Plaintiff's social and adaptive capabilities little weight, in addition to substantial evidence supporting her conclusion. The ALJ's actions did not constitute legal error.

### d. ALJ's Evaluation of Dr. Jill Plevell's Opinion

Plaintiff argues that the ALJ erroneously found Dr. Plevell's IQ test invalid because it did not include testing conditions or an assessment of Plaintiff's level of effort on the IQ test. (Doc. 16 at 9, 12). Dr. Plevell submitted a one-page evaluation, which listed Plaintiff's FSIQ score as 68. (AR 541). Dr. Plevell's analysis consisted of one sentence, which stated, "Results suggestive of significant difficulty with attention/concentration." (*Id.*).

In the administrative hearing, the ALJ mentioned to Plaintiff's attorney the problems with Dr. Plevell's evaluation. The ALJ told counsel:

I don't see that as a very good medical record what [Dr. Plevell] submitted. I mean it doesn't really even say she administered the test, it gives you a

bunch of results and it says what they're suggestive of and it has [Plaintiff's] name on it. But there's really not enough identification evidence in there to really accept that as a medical record.

(AR 98). Plaintiff's attorney responded that she would follow up with Dr. Plevell's office for the full report. (*Id.*). The ALJ concluded the hearing by telling Plaintiff's counsel that she would wait for counsel's submission of these records to make her decision. (AR 104). The Court cannot find, nor does Plaintiff point to, any follow-up reports provided to the ALJ. In her subsequent decision, the ALJ concluded that "[w]ithout further information, I therefore cannot find this December 2015 page constituted a valid IQ score." (AR 25).

On May 2, 2016, Plaintiff filed, though counsel, a Request for Review and 30 Day Extension to Submit New and Relevant Evidence, stating that Plaintiff had asked Dr. Plevell to provide additional information and an explanation of her findings. (AR 5, 158-59). However, there is no evidence that any further documents from Dr. Plevell were ever provided to the ALJ or Appellate Council. Plaintiff had ample opportunity to supplement the record both before and after the ALJ's denial and failed to do so. (AR 1-9).

An "ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).  "[S]ince the results of intelligence tests are only part of the overall assessment [of intellectual disability], the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. Pt. 404, Subpt. P, App.1, 12.00(D)(6)(a).

The Court finds that the ALJ appropriately disregarded Dr. Plevell's conclusions because they essentially amounted to a sequence of numbers with an inexplicable determination that Plaintiff would have difficulties concentrating. It was not legal error for the ALJ to dismiss this terse, conclusory evaluation.

### e. *ALJ's Duty to Develop the Record*

In addition, Plaintiff claims that the ALJ erroneously substituted her own medical opinion in lieu of Dr. Plevell's, and states that because there was a discrepancy between

Dr. Plevell's intellectual score and a cognitive exam given to Plaintiff approximately twenty years prior, the ALJ should have resolved this ambiguity by ordering further testing, rather than relying on an out-of-date exam and her own inappropriate medical opinion. (Doc. 16 at 11-13).

"The obligation to develop the record 'is triggered only when there is ambiguous evidence *or when the record is inadequate to allow for proper evaluation of evidence.*'" *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001) (emphasis added); 20 C.F.R. § 404.1519a(b). "If the ALJ thought [s]he needed to know the basis of [the doctor's] opinions in order to evaluate them, [s]he ha[s] a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). It is ALJ's burden to make a reasonable effort to obtain the information required to make a determination. 20 C.F.R. § 404.1512(b)(1)(i).

### i. *Claimant's Duty to Disclose Evidence*

However, a claimant also has an ongoing duty to disclose evidence, and "[w]hen [a claimant] submit[s] evidence received from another source, [the claimant] must submit that evidence in its entirety." 20 C.F.R. § 404.1512. In addition, the ALJ "will not request a consultative examination until [the ALJ] has made every reasonable effort to obtain evidence from [the claimant's] own medical resources. . . . [An ALJ] may order a consultative examination while awaiting receipt of medical source evidence in some instances, such as when [the ALJ] know[s] a source is not productive, is uncooperative, or is unable to provide certain tests or procedures." 20 C.F.R. § 404.1512(b)(2). This requirement may arise when "[t]he evidence that may have been available from [claimant's] treating or other medical sources cannot be obtained for reasons beyond [the claimant's] control, such as death or noncooperation of a medical source." 20 C.F.R. § 404.1519(b)(2).

In this instance, Plaintiff's counsel knew that the ALJ did not think Dr. Plevell's evaluation was sufficient and agreed to obtain the necessary records. Counsel did not do

so, and did not notify the ALJ that counsel's failure was due to circumstances beyond her control or because of difficulty obtaining the documents. In fact, it seems as though Plaintiff may have received these records, and simply failed to submit them. (AR 158 (stating counsel requested an in-depth explanation by Dr. Plevell, but not indicating receipt of additional information or obstacles to obtaining the information)). *See Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) ("[W]hen claimants are represented by counsel, they must raise all issues *and evidence* at their administrative hearings in order to preserve them on appeal.") (emphasis added). The Court does not find that the ALJ erred by failing to order additional testing because the ALJ made reasonable efforts to obtain Dr. Plevell's complete IQ evaluation, and Plaintiff's counsel never informed the ALJ that the record was unavailable.

### ii. Record Adequate for Proper Evaluation of Evidence

Furthermore, the ALJ found that without ordering further testing, there was sufficient evidence of Plaintiff's cognitive abilities to make a determination that Plaintiff's mental impairments did not meet or equal the criteria for mental disorders under listings 12.02 (Neurocognitive Disorders), 12.04 (Depressive, Bipolar and Related disorders), 12.05 (Intellectual Disorder), 12.06 (Anxiety and Obsessive-Compulsive Disorder), and 12.09 (Substance Addiction Disorder). (AR 19, 25).

To find that a claimant has met the criteria for a mental disorder under the previously mentioned listings (except for listing 12.05), the ALJ must find that claimant has met the diagnostic description of the listed impairment and the criteria under both paragraphs A and B, or paragraphs A and C of the listing.[1] 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.00(A). The ALJ found that Plaintiff had not met the criteria listed in both paragraph B and C, and therefore his impairments did not meet or equal the criteria in the listed impairments.

### 1) Assessment Under Paragraph B Criteria

For a determination of disability under paragraph B (paragraph D criteria in listing

---

[1] The Court evaluates the ALJ's decision under the regulations in effect at the time of the decision, not in the 2018 iteration as Plaintiff suggests.

12.05), claimant must have marked limitations (meaning more than moderate but less than extreme) in two of the following areas: maintaining concentration, persistence, or pace; maintaining social functioning; participating in daily living activities; or repeated instances of decomposition of extended duration. 20 C.F.R. §§404 Pubpt. P, App. 1. "A '[m]arked limitation' means that functioning in these areas independently, appropriately, effectively, and on a sustained basis, is 'seriously limited.'" *Lamonda v. Berryhill*, No. 3:16-cv-00587-HDM-WGC, 2017 WL 8222654, at *13 (D. Nev. Dec. 22, 2017) (citing 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(F)(2)(d)).

Here the ALJ stated that Plaintiff had only moderate difficulty with concentration, persistence, and pace. (AR 23). The ALJ noted that while there was significant evidence supporting his cognitive difficulties in early childhood, a more recent consultative exam indicated a score of 25/30 and was in the low-average range of intelligence. (AR 23, 113, 294, 485). Furthermore, the ALJ pointed to medical records that indicated Plaintiff was capable of remembering simple instructions, and demonstrated a limited ability to concentrate. (AR 27, 498).

As to Plaintiff's social functioning, the ALJ noted that Plaintiff appeared to be doing well socially. He had a girlfriend, spent time with friends, and appeared to be getting along with family better than in the past. (AR 127, 203, 465, 476). The ALJ determined that Plaintiff only had mild difficulties in this area. (AR 23).

The ALJ stated that throughout the claim of disability, medical records revealed that Plaintiff had only moderate limitations in performing activities of daily living. (AR 22). The ALJ listed several instances in which Plaintiff confirmed he was able to perform daily activities with minimal restrictions. (AR 441, 476, 514). In fact, Plaintiff self-disclosed that he was able to do so, but was "just too lazy." (AR 23, 514). Furthermore, Plaintiff appeared to handle social interactions well with only minor anxiety. (AR 23, 441, 484, 514, 535).

Finally, the ALJ stated that there was no evidence of extended periods of decomposition. (AR 23). Plaintiff does not dispute this conclusion.

Because Plaintiff did not have two marked limitations, or a marked limitation with extended decompensation, the ALJ found that Plaintiff was not disabled under the criteria of paragraph B. (*Id.*). A reasonable mind could find that the ALJ provided adequate support and substantial evidence showing Plaintiff had not met the paragraph B criteria in the listings.

### 2) *Assessment Under Paragraph C Criteria*

If an ALJ determines a claimant has not met the criteria listed in paragraph B, the ALJ then must assess the additional functional criteria in paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App.1, 12.00(A).

#### a. *Listings 12.02 (Organic Mental Disorder) and 12.04 (Affective Disorder)*

To qualify as disabled under paragraph C of listings 12.02 and 12.04, a claimant must demonstrate at least a two-year history of chronic organic mental disorder or chronic affective disorder causing more than minimal limitation in performing basic work activities, and either: (1) repeated and extended decompensation; (2) a residual disease process that suggests slight increase in mental demands would cause decompensation; or (3) an inability to function without a supportive living arrangement for one or more years prior. 20 C.F.R. Pt. 404 Subpt. P, App. 1 Listings 12.02, 12.04.

For listing 12.02 and 12.04, the ALJ found Plaintiff had not demonstrated repeated or extended decompensation, or that a change in environment would likely cause decompensation. (AR 23-24). Plaintiff does not claim to have repeated and extended decompensation. Further, the ALJ reiterated that Plaintiff's own testimony was unreliable on the issue of his functional abilities, because he had stated he was able to complete activities of daily living if he so desired, so he had not shown he was unable to function independently. (AR 24, 514).

As demonstrated *supra*, the ALJ's provided adequate support for her credibility determination. Without any evidence of decompensation and several instances throughout the period of asserted disability supporting Plaintiff's ability to function in the activities

of daily living (AR 441, 476, 514), the Court cannot find that the ALJ's determination constituted legal error or was not supported by substantial evidence.

### b. Listing 12.06 (Anxiety-Related Disorder)

To demonstrate that an impairment meets paragraph C of listing 12.06, a claimant must show he is completely incapable of functioning outside of the home on his own. The ALJ showed Plaintiff did not meet this requirement because he was able to drive, go grocery shopping, and to meet friends outside the home. (AR 24, 441, 484, 513). According to the record and Plaintiff's statements, Plaintiff's level of social anxiety appeared to be minor. (441, 484, 514, 535). The Court finds ample evidence in the record supports the ALJ determination as to Listing 12.06.

### c. Listing 12.05 (Intellectual Disability)

The 2015 listing for intellectual disability has a slightly different analysis than the prior listings. A claimant's impediments meet or are equal to listing 12.05 if they demonstrate a "significantly subaverage general intellectual functioning with deficits in adaptive functioning" that began before age 22. Furthermore, a claimant must also satisfy one of four sets of criteria:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g. toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR
> B. A valid verbal, performance, or full scale IQ of 59 or less; OR
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR
> D. A valid verbal, performance or full scale IQ of 60 through 70, resulting in [two marked limitations previously stated in paragraph B of prior sections].

20 C.F.R. § 404, Subpt. P, App.1, Listing 12.05 (emphasis added).

The ALJ mentioned that there was evidence Plaintiff was capable of tending to his personal needs (AR 514), and was able to follow simple directions (AR 498, 557, 559, 561), and therefore did not qualify under paragraph A. Plaintiff does not argue that he is incapable of participating in standardized testing, and in fact asks for an additional IQ

test, therefore, paragraph A does not apply to Plaintiff's claims.

For paragraph B, Plaintiff had two full-scale IQ tests, one finding Plaintiff's IQ was 68, the other 86. Because paragraph B requires an IQ of 59 or less, there is no evidence that Plaintiff was prejudiced because the ALJ did not order further testing because Plaintiff does not assert he would meet the criteria in this paragraph, even if ordered to perform another IQ test.

Therefore, the disputed subsections include paragraphs C and D. Plaintiff argues that the ALJ erred in deciding that Plaintiff's intelligence did not meet the criteria in paragraph C because she failed to consider Dr. Plevell's IQ test, did not order another IQ test to replace it, and instead gave credence to an IQ test given to Plaintiff as a child.

The most recent IQ test, Dr. Plevell's WAIS-IV test, gave Plaintiff an IQ score of 68. (AR 541). The ALJ noted that even if she assumed the test was properly performed there was no indication how Dr. Plevell came to the conclusion that this score meant that Plaintiff had "significant difficulties with attention/concentration. (AR 25).

The second IQ test was a 1992 WISC-R IQ test administered when Plaintiff was merely eight years old, which indicated Plaintiff had an IQ of 86. (AR 294). The ALJ stated that there was no organic degradation or substantial worsening in Plaintiff's mental condition to explain the significant decrease in IQ from 86 to 68. (AR 25).

Plaintiff explains that the difference between the two tests may likely be because they are different tests: WAIS-IV is a test for adults was revised in 2008, while WISC-R is a test for children developed in 1974. (Doc. 16 at 10-11). Furthermore, Plaintiff states that the WISC-R test was only valid for two years, and can only be used to establish that Plaintiff had functional impairment prior to age 22, not to establish current impairment. (*Id.* at 11).

The ALJ found the childhood WISC-R score was consistent with other evidence in the record and there was no indication why Plaintiff's score would have dropped since then. However, this score, when Plaintiff was merely 8 years old, was far beyond the time for which to consider it a valid indicator of IQ. POMS DI 24515.055 (indicating

childhood IQ testing is current for two years). To use only an outdated, childhood IQ score to determine intellectual disability was legal error. "It is essential for complete-rather than partial-sets of IQ scores to be used in evaluating intellectual disability." *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 931 (9th Cir. 2014).

While the ALJ could appropriately discredit Dr. Plevell's IQ test as conclusory, and Plaintiff had a duty to submit all available evidence, this did not permit the ALJ to use a vastly outdated IQ to decide that Plaintiff's IQ was higher than 68. As stated by the Ninth Circuit, "It was legal error for the ALJ not to ensure that the record included a complete set of IQ test results that both the ALJ and the reviewing experts could consider." *Garcia*, 768 F.3d at 929.

However, an ALJ's legal error, standing alone, is not an adequate reason for the District Court to overturn an ALJ's decision, the claimant must also show prejudice. *McLeod v. Astrue*, 6440 F.3d 881, 888 (2011). The reviewing court "will not reverse an ALJ's decision on the basis of a harmless error, "which exists when it is clear from the record the ALJ's error was inconsequential to the ultimate nondisability determination." *Garcia*, 768 F.3d at 932 (internal quotation and citation omitted).

In this instance, Plaintiff has not demonstrated prejudice. Even if the ALJ had ordered a qualifying IQ test, she would not have found Plaintiff intellectually impaired because her decision was based on her conclusion that the evidence did not support Plaintiff's claim that his impairments were "markedly" limited. (AR 27). To find a claimant disabled under listing 12.05(D), Plaintiff must not only have a full-scale IQ score between 60-70, but he must have at least two of the marked limitations as described in paragraph B of the other listings (paragraph D of listing 12.05). In other words, in addition to the IQ results, claimant must meet two marked limitations, either in maintaining concentration, persistence, or pace; in maintaining social functioning; in participating in daily living activities; or by repeated instances of decomposition of extended duration. 20 C.F.R. §§404 Subpt. P, App. 1, 12.05(D). The ALJ had substantial evidence supporting her conclusion that Plaintiff did not meet the requirements under

paragraph B (paragraph D of listing 12.05), an essential component of impairment under listing 12.05(D).

Furthermore, the Court cannot find Plaintiff would be prejudiced under paragraph C either, which requires greater impairment than that of paragraph D. *See Garcia,* 768 F.3d at 929 (describing paragraph D as listing "milder impairments" than paragraphs A-C). Since the ALJ provided substantial evidence supporting her determination that Plaintiff did not exhibit the milder impairments of paragraph D, the Court cannot find that the ALJ would have found the more significant limitations in paragraph C, even if she was provided with an updated WAIS-IV test.

This case is distinguishable from Plaintiff's cited case, *Garcia v. Commissioner of Social Security,* 768 F.3d at 925-938. In that case, the Ninth Circuit stated, "While it is not certain from the record before us that Garcia would have been determined to be disabled if the record had been properly developed, it is also not clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Id.* at 929 (internal citations omitted). The Court does not entertain such doubts in this instance. Here, Plaintiff clearly had a much higher level of intellectual functioning than Garcia, who was unable to read, did not know the alphabet, and needed to be re-taught basic tasks "on a constant basis." *Id.* at 927. In addition, Garcia left her prior work because she misunderstood simple tasks, required constant supervision, and found the work "too difficult." *Id.* at 927.

Unlike *Garcia*, Plaintiff is able to read, write, and follow simple directions. Furthermore, Plaintiff did not leave his past work because the tasks were too complicated. Rather, he left because his probationary period was over. The ALJ's denial under listing 12.05 was not fundamentally based upon the IQ score, though she referenced the older test. The ALJ found Plaintiff was not disabled under listing 12.05 because he did not have the requisite two marked limitations or a "significant work related limitation of function." The ALJ's determination that Plaintiff's functional limitations were moderate was based on substantial evidence in the record, including

Plaintiff's own statements and the evaluations of several physicians. Here, although the IQ scores gave conflicting and possibly ambiguous results, the record was adequate for proper evaluation of Plaintiff's disability under the listings.

Accordingly, IT IS ORDERED:

1. The Commissioner's decision denying benefits is AFFIRMED.
2. The Clerk of Court is directed to enter judgment accordingly.

Dated this 29th day of August, 2018.

Bernardo P. Velasco
United States Magistrate Judge